Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000568
28-NOV-2014
12:16 PM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---oOo---


STATE OF HAWAI'I, Plaintiff-Appellee,
vs.
ANTHONY ANDREW LOCKEN, Defendant-Appellant


CAAP-11-0000568


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR NO. 09-1-1549)


NOVEMBER 28, 2014


NAKAMURA, CHIEF JUDGE, AND FOLEY AND FUJISE, JJ.


OPINION OF THE COURT BY NAKAMURA, C.J.


Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Anthony Andrew Locken (Locken) by felony information and non-felony complaint with second-degree assault against Larsen Kaneda (Kaneda) (Count 1) and third-degree assault against Karinne Wong (Wong) (Count 2). Kaneda went to high school with and was friends with brothers Konrad Bruesehoff (Konrad) and Hans Bruesehoff (Hans), who were Locken's roommates, and Kaneda knew Locken through the brothers. Wong was Kaneda's girlfriend.

The charges stem from an alleged assault that occurred after a group of people, which included Locken, Kaneda, Wong, Konrad, and Hans, had gone out for the evening. The group then went to Konrad's and Hans' house and got into an argument over how Locken had behaved while they were out. Wong alleged that during the argument, Locken grabbed her and kicked her, causing her to feel pain and cry. Kaneda alleged that when he came to his girlfriend's defense, Locken kicked him, causing the dislocation of his right shoulder and an indentation fracture in the bone socket. Locken presented contrary evidence though witnesses who testified that Locken did not grab Wong and did not kick Wong or Kaneda.

After a jury trial, Locken was found guilty of the lesser included offense of third-degree assault on Count 1 and guilty as charged of third-degree assault on Count 2. The Circuit Court of the First Circuit (Circuit Court)[1] sentenced Locken to concurrent terms of probation for one year on each count.

Locken appeals from the "Judgment of Conviction and Probation Sentence" (Judgment) entered by the Circuit Court on July 11, 2011. On appeal, Locken contends that: (1) the Circuit Court erred in allowing the introduction of Locken's "prior bad act," which involved a prior incident where Locken caused a fight that resulted in injury to Konrad; (2) the Circuit Court erred in issuing a "blanket" restriction on defense counsel's cross-examination that precluded him from asking witnesses if they were lying; (3) the Circuit Court erred in denying defense counsel's request to recall a defense witness to ask a question counsel forgot to ask, and that defense counsel's failure to ask the question constituted ineffective assistance of counsel; and (4) the Circuit Court erred in instructing the jury on self-defense. As explained below, we affirm the Circuit Court's Judgment.

---

[1] The Honorable Karen S.S. Ahn presided.

BACKGROUND

I.

The main people involved in this case and their relationship to each other are as follows. Locken was a roommate of brothers Hans and Konrad. Kaneda went to the same high school as Hans and Konrad, was classmates with Konrad, and was friends with both brothers. Wong was Kaneda's girlfriend and was friends with the brothers. Kaneda and Wong knew Locken through the brothers. Locken and Konrad, along with Sean Diaz (Diaz) and Mike Rubino (Rubino), were classmates at a California State university maritime academy. After graduating from the academy, Locken moved to Hawai'i to work and began residing with Konrad and Hans. At the time of the charged incident, Diaz and Rubino resided in California, but were visiting Locken and Konrad in Hawai'i and were staying with Locken, Konrad, and Hans at the brothers' house. The brothers' mother and the mother's boyfriend, Mark Murray (Murray), lived next door.

On the night of the charged incident, a group of eight people, consisting of Locken, Konrad, Hans, Kaneda, Wong, Diaz, Rubino, and Ryan Katahara (a high school classmate of Kaneda and Konrad), went to Dave & Buster's. The group left Dave & Buster's after being there for about two hours. Outside of Dave & Buster's, Locken got into a dispute with a "local guy" and challenged the local guy and his friends to a fight. Wong intervened to break up the confrontation, saying "we don't want any trouble[.]" The potential altercation was averted and the group of eight drove to the brothers' house.

II.

At trial, the testimony of the State's witnesses and the defense witnesses about what happened at the brothers' house diverged sharply. The State called Kaneda and Wong, who testified as follows.

At the brothers' house, Wong asked Locken why he wanted to "cause a scene or cause trouble" and place the people with him at risk of getting hurt. Hans, who had been with the group that

3

evening, was disabled; Hans had a pacemaker in his heart and three artificial discs in his back. Wong had been present less than six months before, when Locken was involved in a similar incident in which Konrad had been "falsecracked" by a "local guy" that Locken wanted to fight.

Wong asked Locken if he was going to pick himself and his pride over his friends' well-being. When Locken responded that he would pick himself, Hans joined the conversation and asked Locken why Locken would say something like that. Locken became aggressive, put up his hands, and challenged Hans to a fight. This angered Hans, who argued with Locken. Konrad blocked and restrained Locken and Rubino blocked and restrained Hans to keep Locken and Hans apart. However, Locken continued to call out Hans, saying he "could take [Hans] down[.]"

Wong tried to calm Locken, telling him that because of Hans' condition with a pacemaker in his heart and artificial discs in his back, Hans could get hurt or die if pushed the wrong way. In response, Locken asked Wong if she wanted to fight too. As Konrad was trying to restrain Locken, Locken grabbed Wong's arm twice and kicked her in the right thigh, causing her to begin crying.

Kaneda got between Locken and Wong and asked Locken, "What are you doing hitting a girl?" Locken started "wheeling kicks" at Kaneda and landed three or four kicks to Kaneda's right shoulder. Murray, the boyfriend of the brothers' mother, came over to break things up. Locken challenged Murray to a fight, saying, "You want to go too, old man?" The brothers' mother then came over and finally separated everyone, with the brothers, Kaneda, Wong, and Katahara going to the mother's house.

The State also called Hans and Murray as witnesses. Hans and Murray corroborated the testimony provided by Kaneda and Wong.

The State presented medical evidence from Dr. Elizabeth Ignacio (Dr. Ignacio), an orthopedic surgeon. Dr. Ignacio testified that Kaneda sustained "an anterior inferior shoulder

4

dislocation," associated tissue damage, and an "indentation fracture" or "impaction fracture"[2/] of his shoulder ball joint, and that the injury was "recent" when she examined him. The State also introduced pictures of Wong taken two days after the incident that showed a large bruise on her leg, as well as bruises on her arm.

### III.

The defense called Diaz and Rubino,[3/] Locken's classmates from the maritime academy, as witnesses. Dias and Rubino presented a markedly different picture of what occurred at the brothers' house. According to their testimony, Wong and Hans were "acting drunk" and were angry at Locken for what had happened earlier that evening. Wong yelled hysterically at Locken, who ignored Wong or told Wong to mind her own business. In response, Wong lunged at Locken and tried to scratch or strike him. Kaneda tried to pull Wong away, and Konrad pushed Locken back into a chair and kept him from getting up. Diaz and Rubino testified that Locken did not grab Wong and did not kick or strike Wong or Kaneda. Locken did not testify at trial.

### DISCUSSION

### I.

Locken contends that the Circuit Court erred in permitting the State to introduce evidence of the prior incident in which a "local guy," whom Locken wanted to fight, "falsecracked" Konrad. Locken claims that the Circuit Court erred in permitting this "prior bad act" evidence pursuant to Hawaiʻi Rules of Evidence Rule 404(b). We disagree.

HRE Rule 404(b) (Supp. 2013) provides, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action

---

[2/] Dr. Ignacio explained that this type of fracture is not what most people think of as a fracture -- when a bone is broken in two pieces -- but described the fracture as like an indentation in a ping pong ball.

[3/] Rubino's testimony was presented through a video deposition.

> in conformity therewith. <u>It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action,</u> such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

(Emphasis added.) Under HRE Rule 404(b), evidence of "other crimes, wrongs, or acts" is admissible when: (1) it is relevant to any fact of consequence other than the defendant's propensity to commit the crime charged; and (2) its probative value is not substantially outweighed by the danger of unfair prejudice. State v. Renon, 73 Haw. 23, 31-32, 828 P.2d 1266, 1270 (1992). A trial court's determination that evidence is relevant turns on the application of HRE Rule 401 (1993)[4] and is reviewed under the right/wrong standard. State v. Cordeiro, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002). The trial court's decision in balancing probative value against unfair prejudice involves the application of HRE Rule 403 (1993)[5] and is reviewed for abuse of discretion. Id.

The list of permissible purposes for the admission of "other bad acts" set forth in HRE Rule 404(b) is not intended to be exhaustive. State v. Clark, 83 Hawai'i 289, 300, 926 P.2d 194, 205 (1996). Under HRE Rule 404(b), any purpose for which bad-acts evidence is introduced is a proper purpose as long as the evidence is not offered solely to prove the defendant's

---

[4] HRE Rule 401 defines "relevant evidence" as follows:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

[5] HRE Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

criminal propensity.  Id. at 301, 926 P.2d at 206 (citing United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir. 1990)).

Here, the prior incident involving Locken was introduced to place in context Wong's conduct in questioning Locken about his behavior earlier that evening, when Locken had challenged a "local guy" and the local guy's friends to a fight. It explained why Wong was so concerned that Locken's actions had placed the safety of others in the group at risk and why she asked Locken whether he would pick his pride over his friends' safety.  The prior incident was relevant to showing the context for the questions directed at Locken by Wong and Locken's reaction to those comments.  It also showed that Wong had good reason for questioning Locken's behavior that evening and thereby assisted the jurors in assessing Wong's credibility.  We conclude that the prior incident was relevant and admissible under HRE Rule 404(b).  See Clark, 83 Hawai'i at 300-03, 926 P.2d at 205-08 (concluding that prior incidents of domestic violence were admissible under HRE Rule 404(b) to show the context of the relationship between the defendant and the alleged victim); State v. Iaukea, 56 Haw. 343, 348-54, 537 P.2d 724, 729-32 (1975) (concluding that evidence of the defendant's prior crimes, which explained and placed in context the complaining witness's statements and actions, was admissible).

In addition, the Circuit Court gave the jury a limiting instruction, which prohibited the jury from using evidence of the prior incident to determine that Locken was a person of bad character.  The jury is presumed to follow a trial court's instruction, and the limiting instruction served to mitigate any unfair prejudice resulting from the evidence of the prior incident.  State v. Kazanas, 134 Hawai'i 117, 129, 336 P.3d 217, 229 (App. 2014).  We conclude that the Circuit Court did not err in admitting evidence of the prior incident.

II.

Locken argues that the Circuit Court erred in issuing a "blanket" restriction on defense counsel's cross-examination that

7

precluded him from asking witnesses if they were lying. A question that accuses a witness of lying may be argumentative and may be precluded on that ground. However, asking a witness if he or she is lying is not always an impermissible question, and therefore, a blanket prohibition against this question is unwarranted. We conclude that the Circuit Court erred to the extent that it imposed a blanket prohibition on defense counsel's asking witnesses whether they were lying. However, under the circumstances of this case, we conclude that any improper restriction imposed by the Circuit Court on defense counsel's cross-examination did not affect Locken's substantial rights and constituted harmless error.

## A.

The issue arose during defense counsel's cross-examination of Kaneda. On direct examination, Kaneda testified that he sustained an injury to his right shoulder as the result of Locken's kicks. However, Kaneda admitted that when he first went to see Dr. Samuel Kim (Dr. Kim) for the injury shortly after the incident, he told Dr. Kim that his right shoulder had been injured after he fell down some steps and landed on the shoulder. Kaneda explained that he lied to Dr. Kim because "I just felt so ashamed of -- because for me, as a boyfriend for [Wong,] I was not there in time for her because it all happened so fast that I could not be able to help her in time. The damage was already done, so -- and I was just ashamed of saying that." Kaneda testified that he later went back and told the doctor what actually happened because the information might help the doctor diagnose and treat his injury.

On direct examination, Kaneda also testified that he did not immediately report the incident to the police because he was scared -- he lived only a few blocks away from Locken and was afraid Locken would retaliate if Kaneda filed a police report. In describing the argument between Locken and Hans that preceded

8

Locken's assault of Wong, Kaneda stated that Hans was frustrated and talking loudly to Locken. Kaneda further testified:

> Q. Okay. And how did [Locken] respond to that?
>
> A. [Locken] took it negative. He -- I saw him becoming aggressive. He actually ran toward -- he was trying to run towards Hans.
>
> Q. Okay. . . . how far apart were they?
>
> A. Let's see. About seven feet, eight feet.
>
> Q. Okay. So they were sort of trying to get at each other?
>
> A. Yes, within that room.

Kaneda then stated that when Hans and Locken were trying to come at each other, Konrad intervened and pushed Locken down into a sofa and Rubino held Hans back.

On cross-examination, defense counsel impeached Kaneda with his prior inconsistent statements to his treating doctors about the cause of the injury. Kaneda admitted that he had lied to his doctors when he told them the injury occurred when he fell down some steps.[6] Kaneda also admitted that he did not tell Dr. Kim that he had been injured by being kicked in the shoulder until after Kaneda had reported the incident to the police. Defense counsel also impeached Kaneda with his prior statements to the police, getting Kaneda to acknowledge that his trial testimony included information he did not tell the police.

In defense counsel's cross-examination of Kandea about his testimony regarding the argument between Locken and Hans that preceded Locken's assault of Wong, the following colloquy took place:

> By Mr. Wilkerson [(Defense counsel)]:
>
> Q. When Hans got over to [Locken], [Locken] was standing in front of the chair?
>
> A. [Locken] or Hans didn't get to [Locken], though. Mike Rubino actually held him back -- held Hans back.

---

[6] Kaneda testified that he had lied to Dr. Kim and Dr. Wong about having fallen down steps, but not to Dr. Ignacio.

Q.      [Locken] never got out of his chair, did he?

A.      No, he was trying to.

Q.      And he was trying to get out of his chair.  He never got out of his chair, right?

A.      Yes.

Q.      Why did you tell the jury earlier that [Locken] took eight steps toward Hans?  That's what you said, right?

A.      Yes.

Q.      Yet that's not true, is it?

A.      No.

Q.      You lied, right?

MS. YOO [(Deputy Prosecutor)]:  Objection, Your Honor --

THE WITNESS:  Yes.

MS. YOO:  -- argumentative.

THE COURT:  Sustained.

BY MR. WILKERSON:

Q.      May the record reflect that the witness just said that he lied.

THE COURT:  Sustained.  That is an argumentative question.

MR. WILKERSON:  May I approach?

THE COURT:  Yes.

(The following proceedings held at the bench:)

THE COURT:  Mr. Wilkerson.

MR. WILKERSON:  Judge, I'm moving for a mistrial.  The prosecutor continually interrupts my legitimate cross-examination with this witness.  Just because the Court believes it's argumentative, the prosecution believes it's argumentative.  It's not argumentative.  I am asking questions.  They're leading questions and if -- just because the prosecution doesn't like my questions does not mean that they're argumentative.  This witness just told the jury that --

THE COURT:  Keep your voice down.

MR. WILKERSON:  The witness just told the jury that -- the witness just told the jury that he lied to them right now -- right now on the stand.

THE COURT:  No, I don't have a problem --

10

MR. WILKERSON: And that somehow --

THE COURT: Wait. I don't have a problem with your cross. I don't have a problem with leading questions. My problem is with the word "lied." I don't think either of you can use it. That is, to me, a conclusory judgment call that the jury has to make. You can be mistaken. We can misspeak or we can lie. It's up to the jury to decide. You can't say, "you're lying, aren't you?" You can't say that.

MR. WILKERSON: The witness agreed that he lied.

THE COURT: Who knows what he -- I don't know.

MR. WILKERSON: I know what he said and I --

THE COURT: And you can bring it out that "didn't you just say he walked several steps toward the other fellow and that's not what happened, is it?" You can ask him, "why'd you say that?" Maybe you don't wanna ask him that but give him a chance to explain. But you cannot use the word "lied" and neither can Ms. Yoo.

MR. WILKERSON: I'm moving for --

THE COURT: That is argumentative. You may move for mistrial, I'm gonna deny it because I think your client can get a fair trial. I don't have any problem with that. I don't have any question about that. I'm telling you, please, do not use the word "lied" because it is an argumentative question -- word to use.

MR. WILKERSON: I'm moving for a mistrial. The prosecution continues to violate Mr. Locken's right to confront this witness. This is the State's star witness with regards to a felony charge; continually interrupted with very inappropriate objections.

THE COURT: All right. Well --

MR. WILKERSON: Not only -- not only -- not only in my cross-examination of this witnesses but in my opening statement as well.

THE COURT: All right. Well, Ms. Yoo, I would expect you to object when you have a -- you feel you have a reasonable and good faith basis to object. I do not want to see objections from anybody just to interrupt, whether -- and that would be an objection and I don't care if it's overruled or sustained -- I just wanna -- I just wanna interrupt somebody. So that goes for everybody here.

Shortly after defense counsel resumed his cross-examination, the following took place:

Q. Mr. Kaneda, now based on what you just told us [that when you tell someone something that is not true, it's a lie], how many times have you lied to the jury today?

MS. YOO: Objection, Your Honor.

11

THE COURT: Sustained. I will -- I will strike that question. It is totally inappropriate. The jury will disregard it. Next question please.

The following day, during a bench conference called in relation to defense counsel's cross-examination of Kaneda about whether he was drunk during an incident Kaneda testified occurred after the charged incident, the following discussion occurred:

THE COURT: No, I think what we'd like to do as well is to make clear that, you know, we're not supposed to be using argumentative terms during questioning. I know this is cross, and I know that, you know, you want to establish certain things which is fine, as long as it's relevant. But to --

MR. WILKERSON: Judge, asking a witness if he is drunk is not argumentative.

THE COURT: I'm not saying it is. I think I'm thinking of the use of terms liberally yesterday like "lied," and that is just not done.

MR. WILKERSON: Asking a witness if he lied?

THE COURT: That is not done. You can argue that at closing.

MR. WILKERSON: That is done, Judge.

THE COURT: This is the establishment of evidence; it's not argument. Your argument, as I think most lawyers know, comes at closing, and I have no problem with that at that point to say look at what he said, he lied. But to say are you lying now --

MR. WILKERSON: Judge --

THE COURT: -- is improper, and I've already said that, okay? That's the way this Court sees it, and that's the way it's going to be.

MR. WILKERSON: If I may, Judge. It's more objectionable for me to argue to the jury that witnesses are liars than for me to ask the witness are you a liar and have the witness say yes, in fact, and that is what I did yesterday.

THE COURT: And I've said I think you should take that up, you know, that's fine with me. Okay, so that's the ruling of the Court.

B.

Given the record, it is not entirely clear the extent to which the Circuit Court's rulings were based on (1) a determination that defense counsel's questions to Kaneda

12

regarding whether he was lying were argumentative in the manner and context in which they were posed, or (2) a belief that asking a witness whether he or she is lying is *per se* improper and should always be prohibited. The former would be a permissible basis for the Circuit Court's rulings, while the latter would not.

A criminal defendant's "right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers v. Mississippi, 410 U.S. 284, 295 (1973); State v. El'Ayache, 62 Haw. 646, 649, 618 P.2d 1142, 1144 (1980); see Michigan v. Lucas, 500 U.S. 145, 149 (1991) (concluding that a criminal defendant's "right to present relevant testimony is not without limitation" (internal quotation marks and citation omitted)); State v. Pond, 118 Hawai'i 452, 463, 193 P.3d 368, 379 (2008). Under HRE Rule 611 (1993), the trial court "shall exercise reasonable control over the mode and order of interrogating witness and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect the witness from harassment or undue embarrassment." The trial court's authority to control the mode of interrogating witnesses and presentation of evidence includes the discretion to prohibit counsel from asking argumentative questions. See Cordeiro, 99 Hawai'i at 420, 56 P.3d 692, 722 (2002); State v. Sanchez, 82 Hawai'i 517, 531-32, 923 P.2d 934, 948-49 (App. 1996); State v. Peseti, 101 Hawai'i 172, 180, 65 P.3d 119, 127 (2003); United States v. Wood, 695 F.2d 459, 464-65 (10th Cir. 1982); Price v. State, 347 S.E.2d 365, 366 (Ga. Ct. App. 1986). The Circuit Court therefore had the authority to sustain an objection to defense counsel's asking 'Kaneda if he was lying if it determined that the question was argumentative.

C.

On the other hand, we conclude that there is no *per se* or blanket prohibition against counsel asking a witness if he or

she is lying. In <u>State v. Maluia</u>, 107 Hawai'i 20, 108 P.3d 974 (2005), the Hawai'i Supreme Court held that the prosecution, "may not ask a defendant to comment on another witness's veracity." <u>Maluia</u>, 107 Hawai'i at 24, 108 P.3d at 978. The court explained that:

> Such questions, referred to as "were-they-lying" questions, are improper for the following reasons: (1) they invade the province of the jury, as determinations of credibility are for the jury; (2) they are argumentative and have no probative value; (3) they create a risk that the jury may conclude that, in order to acquit the defendant, it must find that a contradictory witness has lied; (4) they are inherently unfair, as it is possible that neither the defendant nor the contradictory witness has deliberately misrepresented the truth; and (5) they create a "no-win" situation for the defendant: if the defendant states that a contradictory witness is not lying, the inference is that the defendant is lying, whereas if the defendant states that the witness is lying, the defendant risks alienating the jury (particularly if the contradictory witness is a law enforcement officer).

<u>Id.</u> Based on this reasoning, the court held that it was prosecutorial misconduct for the prosecutor to ask Maluia questions, the "practical effect" of which was to ask Maluia "to comment on the veracity of the prosecution's witnesses." <u>Id.</u> at 25, 108 P.3d at 979.

In this case, however, the Circuit Court sustained objections to questions posed by defense counsel to Kaneda concerning whether *Kaneda himself* was lying. This is much different than the situation presented in <u>Maluia</u>. The policy concerns articulated in <u>Maluia</u> regarding the unfairness of asking one witness to comment on the veracity of another witness's testimony and its effect on invading the jury's province to determine credibility does not arise when the witness is asked to comment on his or her own credibility. Certainly, the witness is competent to render an opinion on his or her own veracity, and the witness's answer to the question "Are you lying?" would be relevant to the jury's assessment of the witness's credibility. We therefore conclude that there is no *per se* prohibition against asking a witness if he or she is lying and that a blanket prohibition against such question is unwarranted. <u>Green v.</u>

14

State, 532 S.E.2d 111, 115 (Ga. Ct. App. 2000) ("To ask the defendant if he himself is lying serves the important function of testing his veracity and credibility and so is well within the appropriate scope of cross-examination."); United States v. Freitag, 230 F.3d 1019, 1024 (7th Cir. 2000) ("[W]e are not troubled by the prosecutor asking a witness to remark on the truthfulness of her own testimony because the witness's reaction and response are proper fodder for the jury's credibility determinations."); State v. Crislip, 796 P.2d 1108, 1115 (N.M. Ct. App. 1990) ("It is not error per se to ask a witness if he is lying."), overruled on other grounds by Santillanes v. State, 849 P.2d 358, 368 n.7 (N.M. 1993) and State v. Belanger, 210 P.3d 783, 792 & n.1 (N.M. 2009).

D.

We hold that the Circuit Court erred to the extent that it imposed a blanket prohibition on counsel asking witnesses whether they were lying. We further hold, however, that under the circumstances of this case, such error was harmless because any improper restriction imposed by the Circuit Court on defense counsel's cross-examination did not affect Locken's substantial rights.

As the Circuit Court noted, there are other ways to impeach a witness's testimony and attack his or her credibility besides asking whether the witness is lying, and the Circuit Court did not preclude defense counsel from pursuing these other methods. The only witness that defense counsel asked if he or she was lying was Kaneda; Locken does not cite to any other witness to whom defense counsel posed (or sought to pose) the "Are you lying?" question, and Locken does not describe how the inability to pose the question adversely affected his defense.

With respect to Kaneda, defense counsel was permitted to thoroughly impeach Kaneda and attack Kaneda's credibility through cross-examination. Defense counsel was able to show that contrary to Kaneda's testimony at trial that his shoulder injury was inflicted by Locken, Kaneda initially told Dr. Kim and Dr.

15

Wong from whom he sought treatment that his shoulder injury was caused by his falling down stairs. Defense counsel elicited evidence that Kaneda did not tell Dr. Kim that he was injured in an assault until after he reported the alleged assault to the police. Defense counsel further elicited numerous differences between Kaneda's trial testimony and the information Kaneda had provided to the police.

For these reasons, we conclude that the Circuit Court's restrictions on defense counsel's ability to ask whether the witness was lying did not affect Locken's substantial rights. See Maluia, 107 Hawaiʻi at 27, 108 P.3d at 981 (concluding that although it was prosecutorial misconduct to ask Maluia to comment on the veracity of the prosecution's witnesses, such improper questions were harmless error); State v. White, 92 Hawaiʻi 192, 205-06, 990 P.2d 90, 103-04 (1999) ("When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness." (block quote format and citation omitted)).

III.

Locken contends that the Circuit Court erred in denying defense counsel's request to recall Diaz, a defense witness, to ask a question counsel forgot to ask. He further argues that defense counsel's failure to ask the question entitles him to relief on the ground of ineffective assistance of counsel. We disagree.

A.

The background regarding defense counsel's request to recall Diaz is as follows. Kaneda had previously testified that he went to the brothers' house two nights after the alleged assault, with his arm in a sling. In response to questions asked by defense counsel, Kaneda denied that anyone asked why he was wearing a sling and denied that he told anyone there that he had been hurt at work earlier that day.

Diaz was called after Kaneda completed his testimony, and Diaz was the last witness to testify that day.  After Diaz was excused, the Circuit Court excused the jury.  Counsel for both sides remained to discuss arrangements for the playing of the videotaped testimony of Rubino the next day.  During that discussion, defense counsel asked for permission to recall Diaz to ask a question counsel forgot to ask.  Defense counsel asserted that he wanted to recall Diaz to impeach Kaneda's previous testimony.  Defense counsel proffered that Diaz would testify that he was present at the brothers' house when Kaneda came over a day after the alleged assault, that Diaz heard Konrad ask Kaneda why Kaneda was wearing a sling, and that Kaneda responded that he hurt himself at work.

The State objected to defense counsel's request to recall Diaz, asserting that Diaz had already been excused and that even if he was still on the stand, the proposed questioning of Diaz was beyond the scope of the State's cross-examination.  Defense counsel argued that if the Circuit Court did not allow him to recall Diaz, then Locken was denied the effective assistance of counsel.  The Circuit Court denied defense counsel's request to recall Diaz.

B.

We conclude that the Circuit Court did not abuse its discretion in denying defense counsel's request to recall Diaz. HRE Rule 611 grants the trial court authority and discretion to "exercise reasonable control over the mode and order of interrogating witness and presenting evidence[.]"  HRE Rule 611(a); see State v. Jackson, 81 Hawai'i 39, 47, 912 P.2d 71, 79 (1996).  Under this rule, "redirect is properly limited to the development, correction and refutation of matters brought out for the first time on cross[.]"  Jackson, 81 Hawai'i at 47, 912 P.2d at 79 (internal quotation marks, citation, and brackets omitted). Defense counsel had a full and fair opportunity to examine Diaz. However, due to oversight, he forgot to ask Diaz a question that he had intended to ask.  Under standard rules of trial practice,

17

an attorney for a party is required to ask all desired questions before a witness is excused. Moreover, as explained further below, Locken has not shown that he was substantially prejudiced by the Circuit Court's denial of his request to recall Diaz. Although the Circuit Court had the discretion to permit defense counsel to recall Diaz, we cannot say that it was an abuse of discretion to deny defense counsel's request.

C.

We also conclude that based on the existing record, Locken has not established that his counsel's failure to ask the question for which he sought to recall Diaz constituted ineffective assistance counsel.

> [T]he defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

State v. Richie, 88 Hawai'i 19, 39, 960 P.2d 1227, 1247 (1998). Locken has failed to show that defense counsel's error resulted in prejudice such that it resulted in the withdrawal or substantial impairment of a potentially meritorious defense.

Defense counsel sought to recall Diaz to impeach Kaneda's testimony. However, as previously discussed, defense counsel, though his cross-examination of Kaneda, had already presented significant evidence to impeach Kaneda and attack his credibility. Defense counsel was able to impeach Kaneda's trial testimony that his shoulder injury was inflicted by Locken through Kaneda's prior inconsistent statements to Dr. Kim and Dr. Wong, who treated Kaneda. Defense counsel also elicited numerous differences between Kaneda's trial testimony and Kaneda's statements to the police. Thus, the additional impeachment of Kaneda sought through the recalling of Diaz was cumulative. See White, 92 Hawai'i at 205-06, 990 P.2d at 103-04 (concluding that the trial court did not abuse its discretion in limiting the scope of defense counsel's cross-examination because the jury had

18

sufficient impeachment information to assess the witness's credibility and motivation to fabricate testimony against the defendant). In addition, Diaz's proffered testimony would only have served to impeach Kaneda's testimony; it would not have impeached the trial testimony of Wong, Hans, or Murray, who all provided testimony supporting the assault charges against Locken.

Furthermore, based on the existing record, Locken has failed to show that the failure ask Diaz the impeachment question resulted in the withdrawal or substantial impairment of a potentially meritorious defense. Although defense counsel proffered his understanding of Diaz's anticipated testimony, there is no affidavit or sworn statement by Diaz in the record. See Richie, 88 Hawai'i at 39, 960 P.2d at 1247 ("Ineffective assistance of counsel claims based on the failure to obtain witnesses must be supported by affidavits or sworn statements describing the testimony of the proffered witnesses."). Thus, exactly what Diaz would have said if recalled remains unclear.

More importantly, the record is not sufficiently developed to determine how the State would have responded if the Circuit Court permitted defense counsel to recall Diaz and to evaluate the effect of the State's response. Kaneda testified that Konrad, Hans, Wong, and Aaron Mandiech (Mandiech) were all present at the brothers' house at the time that defense counsel asserted Diaz allegedly overheard Kaneda tell Konrad that he was wearing a sling because he had been injured at work. Even assuming that Diaz would have testified as proffered by defense counsel, the State may have been able to call Konrad, Hans, Wong, and Mandiech to refute or cast doubt on Diaz's testimony. Under the existing record, we do not know if the State would have been able to call these individuals or what they would have said. We also do not know how the State would have cross-examined Diaz if he testified as proffered. Under these circumstances, Locken has not satisfied his burden of establishing ineffective assistance of counsel.

IV.

Locken argues that the Circuit Court committed plain error in instructing the jury on self-defense.  The Circuit Court instructed the jury on self-defense as follows:

> Self-defense is a defense to the charges of, in Count I, Assault in the Second Degree and its included offense of Assault in the Third Degree; and in Count II, Assault in the Third Degree.
>
> The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable.  If the prosecution does not meet its burden, then you must find the defendant not guilty.
>
> The use of force upon or towards another person is justified if the defendant reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person.
>
> The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which defendant was aware or as the defendant reasonably believed them to be.
>
> The defendant may estimate the necessity for the use of force under the circumstances as he reasonably believed them to be when the force is used without retreating.
>
> "Force" means bodily impact, restraint or confinement, or the threat thereof.
>
> "Unlawful force" means force which is used without the consent of the person against whom it is directed, and the use of which would constitute an unjustifiable use of force.
>
> Self-defense is not available for the offenses of, in Count I, Assault in the Second Degree based upon the requisite state of mind of recklessness or its included offense of Assault in the Third Degree based upon the requisite state of mind of recklessness; or . . . In Count II, Assault in the Third Degree based upon the requisite state of mind of recklessness, if the prosecution proves that:
>
> 1)  the defendant was reckless in believing that he was justified in using force against the other person; or
>
> 2)  the defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against the other person.

(Emphases added.)

20

Locken contends that the instruction was plainly and prejudicially erroneous because it used the phrase "if the prosecution proves that" in discussing the availability of self-defense for assaults based on a reckless state of mind, instead of saying "if the prosecution proves beyond a reasonable doubt that." We disagree.

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Nichols, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006).

Here, as Locken acknowledges, the self-defense instruction begins by instructing the jury that "[t]he burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable." In addition, other instructions provided to the jury confirmed and left no doubt that the prosecution's burden of proof was beyond a reasonable doubt. The jury was instructed:

> You must consider all the instructions as a whole and consider each instruction in the light of all of the others. Do not single out any word, phrase, sentence or instruction and ignore the others. No word, phrase, or instruction is more important just because it is repeated in these instructions.
>
> You must presume the defendant is innocent of charges against him. This presumption remains with the defendant throughout the trial of this case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.
>
> The presumption of innocence is not a mere slogan, but an essential part of the law that is binding upon you. It places upon the prosecution the duty of proving every material element of the offenses charged against the defendant beyond a reasonable doubt.
>
> You must not find the defendant guilty upon mere suspicion or upon evidence which only shows that the defendant is probably guilty. What the law requires before the defendant can be found guilty is not suspicion, not probabilities, but proof of the defendant's guilt beyond a reasonable doubt.
>
> . . . .

> If, after consideration of the evidence and the law, you have a reasonable doubt of the defendant's guilt, <u>then the prosecution has not proved the defendant's guilt beyond a reasonable doubt</u>, and it is your duty to find the defendant not guilty.
>
> If, after consideration of the evidence and the law, you do not have a reasonable doubt of the defendant's guilt, <u>then the prosecution has proved the defendant's guilt beyond a reasonable doubt</u>, and it is your duty to find the defendant guilty.

(Emphases added.)

When read and considered as a whole, we conclude that the instructions plainly and correctly advised the jury that the prosecution was required to prove the defendant's guilt beyond a reasonable doubt, including with respect to negating a claim of self-defense for assaults based on a reckless state of mind. Indeed, the only standard of proof set forth in the instructions with respect to the prosecution is proof beyond a reasonable doubt. Therefore, it is difficult to see how the jury could have been misled into believing that a different standard of proof applied. We conclude that Locken has not shown that the instruction on self-defense was "prejudicially insufficient, erroneous, inconsistent, or misleading." See Nichols, 111 Hawai'i at 334, 141 P.3d at 981.

We also note that the test for self-defense contains both a subjective and an objective prong. "Under the subjective prong the jury is required to evaluate the use of force from the defendant's perspective. . . . [T]he focus is on the circumstances known to the defendant, thus directing the jury to consider the actions of a 'reasonable person in the defendant's position under the circumstances as he believed them to be.'" Pond, 118 Hawai'i at 491, 193 P.3d at 407 (brackets, emphasis, and citation omitted). "Under the objective prong, emphasis is placed on the reasonable person standard so the defendant's use of force must be 'determined from the point of view of a reasonable person.'" Id. (brackets and citation omitted).

In this case, Locken did not testify and therefore there is no direct evidence of his subjective intent. The

State's witnesses provided ample and consistent evidence that Locken assaulted Kaneda and Wong and that he was not acting in self-defense.  The defense witnesses testified that Locken did not grab, kick, or strike Kaneda or Wong.  The evidence supporting a claim of self-defense was therefore weak at best.  Accordingly, assuming arguendo that the Circuit Court's self-defense instruction was erroneous, any error in the instruction would not have contributed to the outcome of the case or affected Locken's substantial rights.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

On the briefs:

Samuel P. King, Jr.
for Defendant-Appellant

Donn Fudo
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee