FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

Electronically Filed
Intermediate Court of Appeals
CAAP-13-0001285
29-FEB-2016
09:35 AM

. IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
JOSHUA R.D. WILLIAMS, Defendant-Appellant

NO. CAAP-13-0001285

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 12-1-0425)

FEBRUARY 29, 2016

NAKAMURA, C.J., FUJISE AND LEONARD, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

Plaintiff-Appellee State of Hawai'i (State) charged
Defendant-Appellant Joshua R.D. Williams (Williams) with
attempted murder in the second degree of David Quindt Jr.
(Quindt). At the time of the charged offense, Williams was
renting a room from and residing with Quindt. The charge stemmed
from Williams' stabbing Quindt in the neck, face, and arm with a
knife, while Quindt was driving his sports utility vehicle (SUV)
and Williams was in the back seat. Quindt sustained injuries,

including a life-threatening 12-centimeter laceration to the neck, a laceration from his nose down through his lip, a deep laceration to his cheek, and a 15-centimeter laceration to his elbow. Williams claimed self-defense, asserting that he stabbed Quindt because Quindt had threatened to kill Williams once the SUV came to a stop.

A jury found Williams guilty as charged. The Circuit Court of the First Circuit (Circuit Court)[1] sentenced Williams to life in prison, with the possibility of parole.

On appeal, Williams contends that the Circuit Court erred in "limiting and excluding" certain evidence he sought to introduce. Prior to trial, Williams filed a notice of his intent, pursuant to Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp. 2015), to introduce statements made by Quindt before the charged incident that: Quindt had done "hard time" in California for the crime of murder; as the result of spending time in jail, Quindt had experience with violence, knew how to fight, and learned how to fight to survive; Quindt knew about "gang-bangers and gang-members"; and Quindt committed the murder, but "got away" with the murder because someone else "took credit for it." Williams did not claim that he could prove the truth of Quindt's statements. In particular, Williams acknowledged that he did not clearly know whether, and would not attempt to prove that, Quindt had committed a murder. Williams, however, argued that Quindt's statements were relevant to show Williams' state of mind and that Williams acted reasonably in using deadly force to defend himself against Quindt.

The Circuit Court ruled before opening statements that Williams would be allowed to introduce evidence that he heard Quindt say that Quindt had been convicted of murder, that Quindt knew how to fight, and that Quindt learned how to fight in jail. The Circuit Court excluded the remainder of the evidence proffered by Williams. Notwithstanding the Circuit Court's

---

[1] The Honorable Karen S.S. Ahn presided.

ruling, Williams was permitted at trial to introduce additional evidence that Quindt said he had killed somebody in the past but had gotten away with it. Williams was also permitted to testify that Quindt bragged about killing people and about the murder charge.

Williams argues on appeal that the Circuit Court erred in limiting the evidence of the statements made by Quindt that Williams sought to introduce. We conclude that in light of the evidence the Circuit Court ruled would be permitted and the evidence that was actually presented at trial, any error in the limitations imposed by the Circuit Court on Williams' proffered evidence did not materially impair his claim of self-defense and was harmless beyond a reasonable doubt. Accordingly, we affirm Williams' conviction.

BACKGROUND

I.

Williams and Quindt first met several weeks before the charged incident. At that time, Quindt worked at West Side Tattoo, was a body piercer, and was training to become a tattoo artist. Williams saw Quindt in front of West Side Tattoo wearing a t-shirt of a rap-rock music group of which Williams was a big fan. They struck up a conversation, learned that they shared an interest in tattoos and piercings, and exchanged phone numbers. A few days later, Williams learned that Quindt was looking to rent a room in Quindt's house, where Quindt resided with his wife and two children. Quindt agreed to rent a room to Williams, and Williams and his four-year-old son moved into Quindt's house.

About three weeks later, as part of Quindt's apprenticeship to become a tattoo artist, Quindt drew a tattoo on Williams' thigh. After the tattoo session, Williams, Quindt, and Quindt's wife left West Side Tattoo around 9:15 p.m., picked up Williams' son, and eventually went home. While Williams took his son into the house, Quindt waited in his car, a 1999 GMC Jimmy SUV, because Quindt and Williams planned to drive to Fred's

3

house.  Quindt had agreed to do a piercing for Fred, who was William's friend.

Quindt became irritated and felt disrespected because of the time Williams kept him waiting.  When Williams returned to the SUV, Quindt and Williams began arguing and yelling at each other.  Shortly after Quindt began driving, Williams jumped out of the SUV.  Quindt stopped the SUV, Williams eventually ended up in the backseat of the SUV, and Quindt resumed driving.

While Quindt was driving, Williams used a knife to stab Quindt in the neck, in the face, and in the left forearm.  Quindt drove into the Waianae Mall Shopping Center (Waianae Mall), Quindt stopped the SUV, and both Quindt and Williams got out. Quindt was bleeding profusely.  Williams subsequently agreed to drive Quindt to the emergency room at the Waianae Coast Comprehensive Health Center (Waianae Health Center) in Quindt's SUV.  When they arrived at the Waianae Health Center, Williams hid the knife he used to stab Quindt.  Quindt was examined by an emergency room doctor at the Waianae Health Center, who stabilized Quindt's bleeding and had Quindt transported by ambulance to the trauma center at Queen's Medical Center.

When Williams was initially questioned by the police, he lied and said that he and Quindt had been attacked by three men at the beach, one of whom stabbed Quindt.  Later, however, Williams admitted that he had stabbed Quindt, claimed that he had acted in self-defense, and described to the police where he had hidden the knife.

II.

A.

Prior to trial, Williams filed a notice of his intent to introduce evidence of statements that Quindt had made to Williams before the charged incident regarding Quindt's "prior bad acts" (Notice of Intent).  The Notice of Intent was filed

pursuant to HRE Rule 404(b).[2] The proffered statements included references to a murder of which Quindt had been convicted but later exonerated. The record indicates that Quindt had been convicted of murder in California and had served several years in prison before being exonerated. It was determined that Quindt's conviction was a case of mistaken identity, and he was exonerated when someone else apparently admitted to committing the murder.

In his Notice of Intent, Williams alleged as follows:

1.  During the 2-3 week time period prior to the date of the incident on March 10, 2012, while [Williams] and [Quindt] were living in the same residence, [Quindt] would bully, berate, insult, criticize and demean [Williams] about his life choices, past history, lack of street knowledge, his relationship with the mother of his child, his child rearing skills, and his family. They would argue and at times, [Quindt] would boast and brag about the following:

    a.  Doing time for the crime of murder in California;

    b.  That [Quindt] did hard time in California;

    c.  That [Quindt] knows how to fight because of the time he spent in jail and that he had to learn to fight to survive;

    d.  That [Quindt] knows about gang-bangers and gang-members;

    e.  That [Quindt] has experience with violence from spending time in jail;

    f.  That [Quindt] "got away" with murder by beating the charge -- because someone else took credit for it;

    g.  That [Quindt] did the crime but got off on a technicality.

---

[2] HRE Rule 404(b) provides, in relevant part:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

B.

Prior to opening statements, the Circuit Court held a hearing on the State's motion in limine to exclude the alleged statements made by Quindt to Williams set forth in Williams' Notice of Intent. Williams asserted that he sought to introduce the proffered statements to prove his state of mind in support of his claim of self-defense. Williams' counsel argued:

> [T]he things that I've included in my 404(b) notice have to do with my client's state of mind and the things that were in his head as a result of statements made by Mr. Quindt that caused [Williams] to then be concerned for his personal safety. So they go directly to his state of mind.

1.

There was no dispute at the hearing that Quindt had been exonerated of the prior murder conviction. The State asserted that Quindt was not involved in the murder and had maintained his innocence; that Quindt's conviction was a case of mistaken identity; and that he was exonerated when someone else confessed to the murder. Williams, through his counsel, acknowledged that Quindt was exonerated of the murder charge in California after being convicted and serving three and a half years of incarceration, when "someone's wife went to the police to tell them that her husband was involved, and that led to a further investigation. And then later it was determined that Mr. Quindt was falsely identified."

While acknowledging that Quindt had been exonerated of the murder charge, Williams' counsel argued that Quindt's statements about the murder were relevant to showing Williams' state of mind at the time Williams stabbed Quindt. Defense counsel stated: "[I]t's my understanding that [Williams] will testify that Mr. Quindt claimed that he was convicted of murder, that he got off on the charge, but the implication being that he may have done it; he may not have done it." The State argued that since Quindt had been exonerated of the murder, permitting Williams to introduce the proffered statements about the murder

6

would create confusion and be prejudicial to the State. The Circuit Court indicated that because Williams' state of mind -- his belief "that Quindt [had] participated in the killing of someone" -- was relevant to Williams' claim of self-defense, it would allow Williams to introduce certain statements by Quindt relating to the murder.

The parties and the Circuit Court then discussed the scope of what Williams would be permitted to say about what Quindt had told him about the murder. The State argued that Williams should be limited to testifying that Quindt bragged that he "maybe" killed someone. The State contended that this would avoid the need to explain that there had been a conviction that was later overturned, which the State believed would be "too much for the jury to consider." Defense counsel stated that she had no problem with the State introducing evidence that Quindt had been exonerated of the murder. However, defense counsel argued that what was "swirling in [Williams'] mind when he's deciding whether or not he needs to act in self-defense" was that Quindt had said: "he was convicted of murder" but "got away with it" because someone else "took the fall"; he did three years of "hard time"; and "to survive in prison, you have to be able to take care of yourself and fight."

The State argued that references to Quindt having been convicted of murder and then exonerated should not be brought up because this would complicate matters and confuse the jury. In response, the Circuit Court asked defense counsel if the defense would agree to refrain from using the word "conviction" and instead elicit evidence that Quindt said he was involved in a murder. Defense counsel responded that Williams would not agree to that limitation because Quindt used the term "conviction" when he spoke to Williams, which is the word that was in Williams' head and one of the reasons Williams feared Quindt. The Circuit Court then ruled that the references to Quindt's murder conviction would be admitted "for state of mind only . . . as to

7

what Williams was thinking at the time." The Circuit Court informed the State that it could "bring in the fact that [Quindt] was exonerated." The Circuit Court asked defense counsel, "[s]o basically [Williams is] going to say Quindt said he was convicted of murder?" Defense counsel responded, "Or use the term "murder conviction." The Circuit Court stated, "All right . . . that's . . . the extent to which he's going to testify as to that at this point."

2.

With respect to the proffered evidence that Quindt said: (1) he knows how to fight, learned how to fight to survive, and experienced violence because of the time he spent in jail, and (2) he "knows about gang-bangers and gang-members," defense counsel argued that this evidence was also relevant to Williams' state of mind pertaining to his claim of self-defense. Defense counsel asserted that during verbal arguments that did not result in physical fights, Quindt would make these statements to Williams to cause Williams to back down. Defense counsel argued that the implication of these statements was that Quindt knew how to fight due to his experiences on the street, namely, gang-banging, and because of the time he served in prison. Defense counsel stated that the defense did not intend to "wallow" in this evidence, but noted that "these snippets" popped in Williams' head and caused "his alarm to go to something higher such that he feels he needs to act in self-defense."

When asked by the Circuit Court what the term "gang-banger" means, defense counsel responded: "It means that you were involved in gang activity, could be involved in fights or involved in just criminal activity having to do with gang membership. I'm not going to go beyond the term 'gangbanger[.]'" The Circuit Court observed that the term does not necessarily connote violent conduct. Defense counsel then stated: "[Williams is] going to use the term 'gangbanger.' I can, I guess, on direct ask him what did that mean to you. But at that -- I

8

wasn't planning to do that. I was just going to be referencing the term."[3/] Defense counsel also asserted that the defense wanted to use the term "prison" rather than "jail."

The State argued that because the Circuit Court was permitting evidence that Quindt had been convicted of murder, it was not necessary, would be prejudicial, and would "open[ ] up a lot of doors for confusion" to permit evidence that Quindt said he was incarcerated or in jail. Regarding the use of the term "jail" versus "prison," the State argued that Williams' Notice of Intent used the term "jail," rather than "prison."

The Circuit Court ruled that it was excluding the proffered evidence relating to "gangbangers" because it thought the term was "too general." The Circuit Court permitted evidence that Quindt said he learned to fight in "jail," apparently denying Williams' request to use the term "prison."

3.

With respect to the evidence of Quindt's statements proffered by Williams in his Notice of Intent, the Circuit Court ruled as follows:

1. With respect to items 1.a. ("Doing time for the crime of murder in California") and 1.b. ("[Quindt] did hard time in California"), the Circuit Court found that these two items were basically the same thing. It ruled that Williams would be permitted to elicit evidence that Quindt said he was convicted for murder.

2. With respect to item 1.c. ("[Quindt] knows how to fight because of the time he spent in jail and that he had to learn to fight to survive"), the Circuit Court permitted evidence that Quindt said he knows how to fight and he learned how to fight in jail.

---

[3/] Defense counsel later stated that Williams interpreted the term "gang-banger" as something beyond just minor gang activity and that "it involves something a little bit more serious and involves more violence."

3.    With respect to item 1.d. ("[Quindt] knows about gang-bangers and gang-members") and 1.e. ("[Quindt] has experience with violence from spending time in jail"), the Circuit Court excluded this evidence as too general.

4.    With respect to items 1.f. ("[Quindt] 'got away' with murder by beating the charge -- because someone else took credit for it") and 1.e. ("[Quindt] did the crime but got off on a technicality"), the Circuit Court excluded this evidence.  The Circuit Court had earlier indicated that if Quindt admitted to Williams that Quindt was involved in the commission of the murder, whether Quindt got off would not be relevant to Williams' state of mind.

### III.

### A.

In opening statement, the State asserted that Quindt will testify that

> he has been involved with the judicial system before.
> [Quindt] will testify that he was convicted of murder.
> However, [Quindt] will also testify that he was later
> exonerated of that murder.  Although [Quindt] did spend some
> time in jail, he will testify that he was released, and the
> conviction was reversed.

(Formatting altered.)

### B.

In Williams' opening statement, defense counsel asserted that the evidence would show that when Williams was in the back seat of Quindt's SUV, Quindt engaged the child locks which prevented Williams from opening the back doors and windows. Defense counsel stated that while Williams was "a prisoner" in the backseat,

> [Williams] remembers how [Quindt] would talk about his
> murder conviction in California.  He knows -- he remembers

> how [Quindt][4] would talk about how he learned how to fight
> in prison because you have to fight -- I'm sorry -- in jail
> because you have to learn how to fight to survive in jail.
>
> Now, all these thoughts are swirling around in his
> head. What's this guy going to do to me? It's a giant
> nightmare. Just as [Quindt] jerks the car into a dark
> parking lot, the parking lot of the Pizza Hut, [Quindt] says
> those words: "When I stop this car, I'm going to fuckin'
> kill you."

Defense counsel stated that Williams then grabbed a pocket knife and stabbed Quindt in order to disable him "so he can't get out of that car and do what he's just said he's going to do."

Defense counsel further asserted that the evidence would show that after the stabbing, Quindt assured Williams that "Nobody is going to go to jail. Nobody is going to jail. It's going to be okay." Defense counsel stated that Quindt's words "get twisted in [Williams'] mind, and he does something incredibly stupid." Defense counsel related that Williams decides to get rid of the knife and then lies to the police by making up a story that he and Quindt were attacked at the beach by other people. In the end, however, Williams admitted that he was the person who stabbed Quindt. Defense counsel asserted that "Joshua Williams stabbed David Quindt in self-defense to prevent David Quindt from acting on his threat."

IV.

A.

At trial, Quindt testified about meeting Williams and then renting a room to Williams. Quindt testified that prior to the charged incident, he had never directly mentioned to Williams that he had been convicted of murder in another jurisdiction. Quindt stated that Williams overheard Quindt discussing the conviction with someone from "the Hawaiian Innocence Project"

---

[4] According to the transcript, Williams' counsel stated that "he remembers how Joshua would talk about how he learned to fight in prison," but it is clear from the context of counsel's remarks that she meant to refer to David Quindt instead of Joshua Williams.

11

over the telephone.[5] Quindt testified that he had been convicted of murder, but that he was exonerated of that murder in 1998.

According to Quindt, on the night of March 10, 2012, the date of charged incident, he was waiting in his SUV for Williams after driving home with Williams, Williams' child, and Quindt's wife. Quindt and Williams were going to the house of Williams' friend, Fred, for whom Quindt had agreed to do a piercing. Quindt was tired, and he was frustrated because he was doing Williams a favor by piercing Fred and wanted Williams to hurry. When Williams returned to the SUV, Quindt complained about having to wait. Quindt and Williams argued with raised voices, and Quindt told Williams, "please don't disrespect me."

As Quindt was driving slowly up the street, Williams opened the passenger door and jumped out of the SUV. Quindt stopped the SUV, told Williams to get back into the vehicle, and said that they "shouldn't be arguing like children." Williams got back into the SUV, but sat in the backseat on the passenger side. Quindt did not push or touch Williams while Williams was outside the vehicle.

Quindt testified that his 1999 SUV had a master lock that controlled all the windows, but there was no master lock that controlled the doors. Each door could be unlocked individually.

According to Quindt, as he was driving towards Fred's house, he heard Williams talking on the phone with Nicole, Williams' girlfriend. This frustrated Quindt because he had helped Williams seek custody of Williams' child and obtain a restraining order against Nicole. Quindt told Williams that Williams was not supposed to be talking to Nicole because of the restraining order against her and that Williams was "messing up his custody case." Williams became "agitated and angry" with

_____

[5] On cross-examination, Quindt testified that after he was stabbed by Williams, he told a detective that he had been "very up front with [Williams]" in reference to Quindt's "history."

Quindt, and they yelled and swore at each other. Quindt then told Williams he wanted Williams "to get the fuck out of my house" because he could not deal with the "stress and drama anymore." He told Williams to "[j]ust take your stuff and get out of my house."

As Quindt was turning into the Waianae Mall, he felt "a hit to [his] right-hand side on [his] face." At first, Quindt thought Williams had punched him, but Quindt realized he had been stabbed when he noticed warm blood "squirting" out and running down his neck onto his shirt. This initial stabbing caused a laceration from Quindt's right ear all the way down to his Adam's apple. Quindt tried to fight off Williams as Williams was reaching over from the backseat to stab Quindt again. Quindt alternately gassed the SUV and hit the brake in an attempt to throw Williams off balance and prevent Williams from stabbing him. Besides the initial stabbing, Williams also stabbed Quindt "straight through [his] septum, [his] nose" with the blade cutting through his upper lip and coming out the left side of his cheek. Williams attempted to stab Quindt in the chest, and Quindt had a "cut mark" on his chest, a laceration to his left arm, and cuts to his fingers.

The knife Williams used to stab Quindt belonged to Quindt's son. Quindt and his son were active in the Boy Scouts and Quindt had bought identical knives for himself and his son. Quindt had seen Williams with the knife earlier that day. Quindt was carrying his knife in his back pocket. Quindt, however, did not attempt to take out his knife while Williams was stabbing him because Quindt was seat-belted in and there was no way he could retrieve the knife from his back pocket.

After being stabbed, Quindt hit a curb in the parking lot, put the SUV in park, jumped out, and ran in front of the SUV. Williams also got out of the vehicle. Quindt tried to dial 911 on his phone, but his touch screen did not work because there was blood covering the screen. Williams used his phone to call

his mother. Quindt heard Williams tell his mother, "I'm going to go to jail, I just stabbed [Quindt]."

Quindt felt weak because he had lost so much blood. Quindt told Williams, "if I die, you're going to get in more trouble" and asked Williams to drive him to the hospital. Williams drove Quindt to the emergency room at the Waianae Health Center. Afraid for his life and that Williams would retaliate against him, Quindt told Williams, "[D]on't worry, I won't get you into trouble." When they arrived at the Waianae Health Center, Williams ran down the hill towards the ocean and told Quindt he was going to get rid of the knife. Quindt did not tell Williams to get rid of the knife or to make up a story about Quindt being attacked by three unknown males. While in the SUV driving to Fred's house prior to being stabbed, Quindt did not threaten to kill Williams or to hurt Williams and did not remember threatening to "kick [Williams'] ass or beat him up."[6]

B.

Honolulu Police Department (HPD) Detective Ernest Robello (Detective Robello) testified that two days after the stabbing, he interviewed Williams at the police station. Williams was a suspect and had already been placed under arrest in the attempted murder investigation. Williams was interviewed twice by Detective Robello on that day.

According to Detective Robello, during the first interview, Williams basically repeated the story he had given to HPD patrol officers at the Waianae Health Center. Williams stated that he and Quindt had gone to a beach park called "Green Lantern"; that they had a confrontation with three males they did not know; that the three males followed them to the Waianae Mall; and that a fight ensued during which one of three males stabbed Quindt. Williams, however, changed his story and admitted to

---

[6] On cross-examination, Quindt admitted that in a post-stabbing interview, he told a detective that during a prior incident after Williams threatened him, he told Williams, "Dude, you keep disrespecting me, . . . I'm going to kick your fuckin' ass."

stabbing Quindt when Detective Robello confronted him with information learned in the investigation. Williams said that it was Quindt who suggested that they come up with the false story. Williams said that the knife he used to stab Quindt belonged to Quindt's son and that he had obtained the knife from Quindt's house.

Detective Robello interviewed Williams a second time about an hour after the first interview ended. When asked about the location of the knife, Williams said it could not be recovered as he had thrown the knife into the ocean. However, later in the second interview, Williams admitted that he had not thrown the knife into the ocean but had hidden it on the grounds of the Waianae Health Center. Williams drew a diagram showing where he had hidden the knife.

During the second interview, Williams stated that he stabbed Quindt in self-defense. Williams did not say that Quindt made any type of aggressive or threatening move toward Williams which prompted the stabbing; rather, Williams indicated that he thought Quindt was reaching for his back pocket where Williams knew Quindt normally kept his knife. Detective Robello asked Williams, "So basically you did kind of a preemptive strike?", to which Williams responded, "[Y]es." Williams stated that in his mind he was thinking "I have to either kill him, or he's going to kill me." Detective Robello asked Williams, "So you stabbed him with the intent to kill him before he could kill you?" Williams' response was "Yes."

On cross-examination, Detective Robello stated that during the second interview, Williams said that he felt that he had to act in self-defense, that he was afraid for his life, and he knew some of Quindt's previous history. Defense counsel elicited Detective Robello's testimony that "[Williams] said that the night before the stabbing, during an argument between the two of them, [Williams] said that Mr. Quindt had said that he had been incarcerated. He had killed somebody in the past and gotten away with it."

C.

The police recovered the knife that Williams had used to stab Quindt on the grounds of the Waianae Health Center in the area where Williams said he had thrown it. The knife was a folding knife that was eight inches long with the blade extended.

Dr. Eric Nino (Dr. Nino), the emergency room doctor who treated Quindt at the Waianae Health Center, testified about the stab wounds suffered by Quindt. Dr. Nino testified that Quindt had a 12-centimeter laceration to the right side of his neck, a deep laceration to his left cheek, a laceration from his nose down through his lip, and a 15-centimeter laceration to his left elbow. Dr. Nino opined that the wound to the right side of Quindt's neck was "life-threatening" and caused "a substantial risk of death." Quindt's injuries required that he be seen immediately at a trauma center. Because the Waianae Health Center was not set up as a trauma center, Dr. Nino stabilized Quindt's wounds and had him transported to Queen's Medical Center.

V.

Williams testified in his own defense at trial. Williams rented a room from Quindt and had lived with Quindt and his family for about three weeks before the stabbing incident.

According to Williams, after moving in with Quindt, there were times when they "would kind of butt heads" and described Quindt as "an Alpha male." Williams and Quindt "clashed a few times, had a few arguments," and "[Quindt] lost his temper very easily" and when he lost his temper, "he would want to fight." Williams described himself as the type of person who does not like confrontation that much and would usually walk away. During Williams' arguments with Quindt, "[t]here was never actually physical blows thrown[,]" although a few times they came close to "an actual altercation."

With respect to whether they had conversations about Quindt's past, Williams testified:

> There was times when [Quindt] and I were discussing things about our past or whatnot, and [Quindt] would bring it up nonchalantly, kind of bragging about an alleged attempted murder that he committed.
>
> [Defense Counsel:] Q. Okay. So what -- I guess -- well, first of all, did this come up in a conversation between the two of you?
>
> A. Yes, a few times.
>
> Q. And let's just clarify. Did you overhear him talking about a murder conviction in a phone conversation he was having with someone else, or did you have a direct conversation with him?
>
> A. I never overheard him on a conversation at all. There was direct speaking of the murder charge. He bragged about it multiple times. I don't know if he was trying to make himself look good or look bad. In my eyes, I just -- I was frightened by it really in the long run.
>
> . . . .
>
> A. Anytime an altercation would happen, anytime that he would lose his temper, it was the first thing in my mind, was that that had happened and that he bragged about it. So it was, I guess, a touchy subject or it -- it alarmed me.

On the evening of the stabbing, after arriving home, Quindt asked Williams to hurry while Quindt waited in the SUV to go to Fred's house to do a piercing and Williams took his son inside. When Williams returned to the SUV, Quindt was upset and yelled at Williams for taking so long and also began cursing and yelling at Williams about other matters. As they drove away from the house and approached a stop sign, Williams jumped out of the SUV and began walking back to the house.

According to Williams, Quindt pushed him from behind and he fell to the pavement. Quindt challenged Williams to a fight, saying, "[Y]ou think I'm afraid of you? I learned how to fight in jail. I'm not afraid of you. Let's do this, let's throw." Williams told Quindt that he did not want to fight. Quindt then grabbed Williams, pushed him towards the SUV, opened the driver's side rear door, pushed Williams into the SUV, and slammed the door. Quindt jumped into the SUV and resumed

17

driving.  Quindt drove erratically, rocking the truck so Williams was being thrown around "a little" in the back seat.  Quindt was yelling at Williams, and Williams apologized, attempting to calm and diffuse the situation.  Williams tried to open the door, but discovered that he could not open the door or window because the child safety locks were engaged.  Williams saw Quindt looking at him through the rear view mirror, and Quindt had a "sardonic smile" as if to say "I got you, . . . you're not getting anywhere."

Williams testified that at this point, he was thinking, "[H]oly shit, I'm trapped, I'm stuck in this guy's truck.  He's murdered before.  He's yelling at me, screaming at me.  What am I going to do?"  Quindt then looked back at Williams and said, "[W]hen I stop this truck, I'm going to fucking kill you."  Williams testified:

> The main thing that kept going through my mind was that [Quindt] brags about killing people, and I didn't know if he was for real about it.  I didn't know if he was joking about it.  I didn't know if he would actually kill me.  I didn't know anything at that point.  I was scared.  I was petrified.  In my mind, I really thought I was going to die.

As Quindt turned up a dark road, Williams took the knife out of his pocket and stabbed Quindt.  Williams stabbed Quindt in the neck.  When Williams "pulled [the knife] out," Quindt turned.  Williams stated: "And I was going to stab him again, and he put his hand up; and he deflected it, and he got his arm.  When it came out of his arm, it cut his face.  He had a nose ring, and I think his nose ring ripped out of his nose.  I stabbed him two times."

Quindt turned into the Waianae Mall parking lot and stopped the SUV.  Williams testified that he reached over the driver's seat, rolled down a back window, opened the door from the outside, and jumped out of the SUV.  Williams was distraught because he had "just stabbed my friend."  Williams called his mother.  While waiting for her to answer, he noticed that Quindt was bleeding badly from the neck, and Williams told Quindt that

Quindt did not look good. Williams drove Quindt to the Waianae Health Center. On the way, Quindt talked to Williams' mother and told her "everything's going to be okay . . . nobody's going to jail[.]" Quindt also told Williams not to worry and not to tell the police what happened. When they arrived at the Waianae Health Center, Quindt told Williams, [D]on't tell the police that you did anything, tell 'em something else." Quindt also told Williams to "get rid of [the knife]."

Williams ran down the roadway of the Waianae Health Center and threw the knife in a drainage area. Williams had blood on his hands and arm and went inside the Waianea Health Center and washed up. When the police arrived and asked for a statement, Williams "made up a story about getting jumped by three guys that followed us from a beach park" and one of them stabbing Quindt. This was not a story that Quindt had specifically told Williams to tell; rather, Williams made up this story himself. During his first interview with Detective Robello, Williams maintained the same story about the three guys from the beach park, but later in the interview decided to "come clean" and admit that he had stabbed Quindt.

On cross-examination, Williams admitted that the first interview statement he gave to Detective Robello reflected that he abandoned his story about the three males when Detective Robello confronted William with information provided by a security guard and referred to a security video of the Waianae Mall parking lot. Detective Robello told Williams that a security guard at Waianae Mall saw that Quindt was injured and overheard Williams tell someone over the phone that he had "stabbed [Quindt]." Detective Robello also referred to a security video showing Quindt's vehicle in the Waianae Mall parking lot.

Williams also admitted that he told Detective Robello that after he stabbed Quindt in the neck, he could have run off and he wanted to run off, but he panicked. The prosecutor asked

Williams if he responded "Yeah" when Detective Robello had asked him whether the first stabbing of Quindt was "kind of like a preemptive strike[.]" Williams responded to the prosecutor's question by stating: "That's what [Detective Robello] asked me, yes." Williams testified that "it was either him or me, and I wasn't going to let it be me." Williams admitted that when he stabbed Quindt, he intended to kill Quindt by stabbing him.

## VI.

The jury found Williams guilty as charged. The Circuit Court sentenced Williams to life imprisonment with the possibility of parole, and it filed its Judgment on May 9, 2013. This appeal followed.

## DISCUSSION

On appeal, Williams contends that the Circuit Court erred in imposing limitations on "prior bad act" statements he asserts were made by Quindt that Williams sought to introduce to support his claim of self-defense. As explained in greater detail below, we conclude that in light of the evidence that the Circuit Court ruled would be permitted and the evidence that was actually admitted at trial, any error in the Circuit Court's pre-opening-statement limitation of Williams' proffered evidence was harmless beyond a reasonable doubt. The limitations imposed by the Circuit Court did not materially impair Williams' claim of self-defense.

## I.

Williams did not dispute that he stabbed Quindt and inflicted the injuries sustained by Quindt. Williams' theory of defense at trial was self-defense.

The standards applicable to a claim of self defense are set forth in Hawaii Revised Statutes (HRS) § 703-304 (2014), which provides in relevant part:

> (1) . . . [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

> (2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death [or] serious bodily injury . . . .
>
> (3) . . . [A] person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be . . . .

In evaluating a defendant's claim of self-defense, "the evidence must be assessed from the standpoint of a reasonable person in the defendant's position under the circumstances as the defendant subjectively believed them to be at the time he or she tried to defend himself or herself." State v. Lubong, 77 Hawaiʻi 429, 433, 886 P.2d 766, 770 (App. 1994). The test for self-defense contains both a subjective and an objective prong. Id. "Under the subjective prong the jury is required to evaluate the use of force from the defendant's perspective. The focus is on the circumstances known to the defendant, thus directing the jury to consider the actions of a reasonable person in the defendant's position under the circumstances as he believed them to be." State v. Locken, 134 Hawaiʻi 376, 389, 341 P.3d 1175, 1189 (App. 2015) (internal quotation marks, citation, brackets, and ellipsis points omitted). "Under the objective prong, emphasis is placed on the reasonable person standard so the defendant's use of force must be determined from the point of view of a reasonable person." Id. (internal quotation marks and citation omitted).

"Under common law, a defendant who claims self-defense to a charge of homicide is permitted to introduce evidence of the deceased's violent or aggressive character either to demonstrate the reasonableness of his apprehension of immediate danger or to show that the decedent was the aggressor." State v. Lui, 61 Haw. 328, 329, 603 P.2d 151, 154 (1979). Where such character evidence is offered to show the defendant's state of mind to prove the reasonableness of the defendant's apprehension, the defendant must lay a foundation that he or she knew of the deceased's character for violence at the time of the homicide.

Id. This foundation is not required when evidence of the deceased's violent character is offered to prove that the deceased was the first aggressor. Id.

The common law rule set forth in Lui was codified in HRE Rule 404(a)(2) (Supp. 2015), which provides in relevant part:

> (a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> . . .
>
> (2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused[.]

## II.

On appeal, Williams cites HRE Rule 404(a)(2) and Lui in arguing that the Circuit Court erred in limiting the evidence he proffered regarding Quindt's statements. Williams argues that the evidence of Quindt's "prior bad act" statements primarily related to Williams' state of mind to show the reasonableness of Williams' apprehension of immediate danger, but that the evidence was also relevant to show that Quindt had been the first aggressor.

Although the proffered evidence was clearly relevant to showing Williams' state of mind, it is questionable whether the proffered evidence was relevant to establishing that Quindt had a violent character under HRE 404(a)(2) to support a claim that Quindt had been the first aggressor. First, Quindt's statements, if offered to prove the truth of the matters asserted, constituted hearsay. Williams did not offer any substantive evidence that Quindt's statements were true. HRE Rule 404(a)(2) authorizes a defendant to introduce evidence of a victim's pertinent character trait to prove action by the victim in conformity with that character trait. However, if the evidence offered to prove the victim's character trait is weak, equivocal, or untrue, there is no reasonable basis to infer that the victim acted in conformity with the purported character trait.

22

Here, the most significant evidence proffered by Williams was Quindt's statements that he had been convicted of, or had committed, a murder. However, there was no dispute that Quindt had in fact been exonerated of the murder conviction, that his conviction had been a case of mistaken identity, and that someone else had admitted to committing the murder. Williams did not claim that he could prove the truth of Quindt's statements about having committed murder, and Williams' counsel told the Circuit Court before opening statements that Williams would not attempt to prove that Quindt had committed a murder. Accordingly, Quindt's statements about the murder did not show that Quindt had a violent character or that he acted in conformity therewith on the date of the charged incident.

Second, at trial, Williams did not offer the evidence of Quindt's statements as character evidence under HRE Rule 404(a)(2). Williams also did not seek to admit Quindt's statements to prove that Quindt was the first aggressor. Instead, Williams only offered Quindt's statements under HRE Rule 404(b) to prove Williams' state of mind -- to show that he reasonably believed that using deadly force in stabbing Quindt was immediately necessary to protect himself against death or serious bodily injury.

III.

HRE Rule 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

Under HRE Rule 404(b), "prior bad act" evidence is admissible when: (1) it is relevant to any fact of consequence other than to show action in conformity therewith; and (2) its probative value is not substantially outweighed by the danger of unfair prejudice. See State v. Renon, 73 Haw. 23, 31-32, 828 P.2d 1266,

23

1270 (1992). The trial court's decision in balancing probative value against unfair prejudice involves the application of HRE Rule 403 (1993)[1/] and is reviewed for abuse of discretion. State v. Cordeiro, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002). A trial court does not abuse its discretion unless it "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Matias, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) (internal quotation marks, citation, and brackets omitted).

IV.

Through his Notice of Intent filed pursuant to HRE Rule 404(b), Williams sought to introduce statements he claimed that Quindt had made to him prior to the stabbing. The sole basis on which Williams offered and sought to introduce these statements was to prove his state of mind at the time of the stabbing to support his claim of self-defense. The statements proffered by Williams were that Quindt would "boast and brag about the following:

a.  Doing time for the crime of murder in California,

b.  That [Quindt] did hard time in California;

c.  That [Quindt] knows how to fight because of the time he spent in jail and that he had to learn to fight to survive;

d.  That [Quindt] knows about gang-bangers and gang-members;

e.  That [Quindt] has experience with violence from spending time in jail;

---

[1/] HRE Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

f.   That [Quindt] 'got away' with murder by beating the charge -- because someone else took credit for it;

g.   That [Quindt] did the crime but got off on a technicality."

The Circuit Court ruled before opening statements that Williams would be allowed to introduce Quindt's statements that Quindt had been convicted of murder, that Quindt knew how to fight, and that Quindt learned how to fight in jail.

A.

We conclude that the evidence permitted by the Circuit Court satisfied the requests made by Williams in items a., b., c., and e. The evidence that the Circuit Court permitted was in substance equivalent to the evidence that Williams had proffered in these items with respect to the purpose for which the evidence was offered, namely, showing Williams' state of mind in relation to his claim of self-defense. Permitting evidence that Quindt told Williams that Quindt was convicted of murder and that he knew how to fight and learned how to fight in jail conveyed the same message to the jury as the proffered evidence that Quindt told Williams that Quindt did hard time for the crime of murder and that as a result of spending time in jail, he knew how to fight, learned how to fight to survive, and experienced violence. A person convicted of murder would have been adjudged guilty of committing the crime of murder, and a jury would naturally infer that a convicted murderer who knew how to fight and learned how to fight in jail would have done "hard time," experienced violence in jail, and learned how to fight to survive.

We are also not persuaded by Williams' claim that the Circuit Court erred by limiting him to using the term "jail" rather than "prison." In the context of a convicted murderer who knew and learned how to fight due to his incarceration, we fail to see any material difference between using the term "jail" rather than "prison" in describing the incarceration.

25

Accordingly, we conclude that the Circuit Court did not abuse its discretion in its rulings on items a., b., c., and e.

B.

With respect to items d., f., and g., we need not decide whether the Circuit Court abused its discretion in ruling on these items because we conclude that any error was harmless beyond a reasonable doubt.

1.

With respect to items f. and g., that Quindt said he committed a murder but had beaten the charge on a technicality, although the Circuit Court excluded this evidence at the motion in limine hearing, it permitted Williams to introduce the substance of this evidence at trial.[8] Williams was permitted to elicit evidence from Detective Robello that "[Williams] said that the night before the stabbing, during an argument between the two of them, [Williams] said that Mr. Quindt had said that he had been incarcerated. He had killed somebody in the past and gotten away with it."

In addition, the Circuit Court permitted Williams to testify:

> There was times when [Quindt] and I were discussing things about our past or whatnot, and [Quindt] would bring it up

---

[8] The apparent discrepancy between the Circuit Court's ruling at the motion in limine hearing and its permitting the evidence to be admitted at trial may be explained as follows. When it ultimately made its ruling on items f. and g. at the motion in limine hearing, the Circuit Court had already ruled that Williams could introduce Quindt's statement that Quindt had been convicted of murder. In addition, although the Circuit Court informed the State that it could introduce evidence that Quindt had been exonerated, the State indicated that it was not planning to introduce such evidence because it would complicate matters and confuse the jury. The Circuit Court presumably felt that if the jury heard that Quindt stated he had been convicted of murder, without evidence of his exoneration being presented, there was no need for the jury to hear references to Quindt's beating the charge or getting off on a technicality. If evidence of exoneration was not presented, Quindt's statement that he was convicted of murder would support Williams' belief that Quindt had committed murder and Quindt's getting off on a technicality would not be relevant to Williams' state of mind regarding Williams' claim of self-defense. However, the State subsequently decided to elicit evidence that Quindt had been exonerated of the murder charge. After this evidence was introduced, the Circuit Court permitted Williams to introduce the evidence referred to in items f. and g., that Quindt said he had murdered someone but had beaten the charge and gotten off.

nonchalantly, <u>kind of bragging about an alleged attempted murder that he committed</u>.

[Defense Counsel:] Q. Okay. So what -- I guess -- well, first of all, did this come up in a conversation between the two of you?

A. Yes, a few times.

Q. And let's just clarify. <u>Did you overhear him talking about a murder conviction in a phone conversation he was having with someone else, or did you have a direct conversation with him</u>?

A. I never overheard him on a conversation at all. <u>There was direct speaking of the murder charge. He bragged about it multiple times. I don't know if he was trying to make himself look good or look bad. In my eyes, I just -- I was frightened by it really in the long run</u>.

. . . .

A. <u>Anytime an altercation would happen, anytime that he would lose his temper, it was the first thing in my mind, was that that had happened and that he bragged about it.</u> So it was, I guess, a touchy subject or it -- it alarmed me.
)

(Emphases added).

The Circuit Court further permitted Williams to testify that just prior to stabbing Quindt:

I'm thinking holy shit, I'm trapped, I'm stuck in this guy's truck. <u>He's murdered before</u>.

. . . .

The main thing that kept going through my mind was that <u>[Quindt] brags about killing people</u>, and I didn't know if he was for real about it. I didn't know if he was joking about it. I didn't know if he would actually kill me. I didn't know anything at that point. I was scared. I was petrified. In my mind, I really thought I was going to die.

(Emphases added.)

The record shows that Williams was in fact permitted to introduce the substance of the evidence he sought to introduce in items f. and g. -- that regardless of whether Quindt had been exonerated of his murder conviction, Quindt had stated, and Williams believed, that Quindt had committed murder. Accordingly, any error in the Circuit Court's ruling on these items was harmless.

27

2.

With respect to item d.,[9] that Quindt stated that he "knows about gang-bangers and gang-members," Williams indicated at the motion in limine hearing that he sought to introduce this evidence to show his state of mind regarding Quindt's ability to fight.[10] Defense counsel also stated that the fighting skills learned while incarcerated in prison would be higher and more significant to Williams' state of mind and fear than fighting learned on the street.

Here, the Circuit Court permitted Williams to introduce evidence that Quindt stated he had been convicted of murder, that he had killed someone in the past and gotten away with it, that he had been incarcerated, that he knew how to fight, and that he learned how to fight in jail. The proffered evidence that Quindt stated he knew about gang-bangers and gang-members, offered to show that Williams believed Quindt knew how to fight, was covered by, merely cumulative of, and less significant than the evidence admitted into evidence. Therefore, any error in the Circuit Court's exclusion of item d. was harmless.

3.

Moreover, the State presented compelling evidence to negate Williams' claim of self-defense. The evidence showed that prior to the day of the stabbing, Quindt had not had any physical altercations with Williams. Williams' actions in stabbing Quindt

---

[9] In excluding item d., the Circuit Court determined that the term "gang-banger" was too general and did not necessarily connote violent conduct. When asked what "gang-banger" meant, defense counsel stated, "It means that you were involved in gang activity, could be involved in fights or involved in just criminal activity having to do with gang membership. I'm not going to go beyond the term 'gangbanger.'" Defense counsel later vaguely described Williams' interpretation of "gang-banger" as "[Williams] thinks it's something beyond just . . . minor gang activity, and it involves something a little bit more serious and involves more violence."

[10] At the hearing, the Circuit Court asked, "What's this gangbanger stuff? I mean, does he just talk: I've learned to fight on the street?" Defense counsel replied, "Yeah. I mean, there's on the street, gangbanging. There's in prison you got to learn how to fight on day one. You got to learn to take care of yourself, you know. It's a combination of all that."

in the neck, face, and arm, causing Quindt to sustain injury described as "life-threatening," were not in response to any overt physical action taken by Quindt against Williams. Rather, Williams admitted to Detective Robello that his stabbing of Quindt was basically a "preemptive strike." Quindt was occupied driving his SUV when Williams stabbed him from behind, and the stabbing came as a complete surprise to Quindt, who initially did not realize that he had been stabbed. Williams hid the knife and initially lied to the police by claiming that Quindt had been stabbed by an unknown male after a confrontation at the beach, behavior which showed a consciousness of guilt and was inconsistent with a legitimate claim of self-defense. The compelling evidence presented by the State to refute Williams' claim of self-defense, which supported the State's position that Williams did not reasonably believe that his use of deadly force in stabbing Quindt was immediately necessary to protect himself against death or serious bodily injury, reinforces our conclusion that any error in the Circuit Court's rulings with respect to items d., f., and g. was harmless.

V.

Finally, we note that although at trial Williams did not seek to admit or argue for the admission of Quindt's statements to prove that Quindt was the first aggressor, he contends for the first time on appeal that the Circuit Court abused its discretion in limiting the proffered evidence because it was relevant to his first-aggressor claim. We disagree.

First, Williams waived this argument by failing to present it to the trial court. See State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal."); State v. Ildefonso, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992) ("Our review of the record reveals that [the defendant] did not raise this argument at trial, and thus it is deemed to have been waived."); State v. Moses, 102

29

Hawai'i 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]"). At trial, Williams only argued that the proffered evidence was relevant to his state of mind to show the reasonableness of his belief that the immediate use of deadly force was necessary; he did not argue that the proffered evidence was relevant to a first aggressor claim.

Second, the probative value of the proffered statements to show that Quindt was the first aggressor was nonexistent or tenuous at best. As noted, the proffered statements, if offered to prove the truth of the matters asserted, constituted hearsay; the proffered statements could not be used as substantive evidence that the matters asserted in Quindt's statements were true. However, the probative value of the proffered statements to prove that Quindt had a violent character, and thereby permit the inference that he had been the first aggressor, depended on the matters asserted in the proffered statements being true. Williams did not claim that he could prove the truth of Quindt's statements about having committed a murder, and it was undisputed that Quindt had been exonerated of the charged murder. Williams also did not proffer any substantive evidence that would show that Quindt in fact knew gang-bangers or gang members or that would prove the truth of any of the other proffered statements.[11]

Under the circumstances, even if Williams had sought to admit the proffered statements on the first-aggressor issue, there would have been no error in the Circuit Court's declining to admit the proffered statements on that issue. We conclude that the Circuit Court did not commit plain error in failing to

---

[11] We also note that permitting the introduction of substantive evidence at trial with respect to whether Quindt in fact had committed the murder, despite being exonerated, and whether Quindt in fact knew gang-bangers or gang members would have raised collateral issues, resulted in undue delay, distracted the jury, and caused jury confusion. See HRE Rule 403.

admit the proffered evidence with respect to Williams' first-aggressor claim.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

On the briefs:

Taryn R. Tomasa
Deputy Public Defender
for Defendant-Appellant

James M. Anderson
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*